Next case is number 16, 2159 in Re Medical Biomech Partnership, Mr. Farquhar. Good afternoon, Your Honors. May it please the Court. Really, there are three main issues here that present in this case. I'm going to start by saying I found your brief really confusing and difficult to follow, and I hope that you can be clearer about what your contentions are today because I had a very difficult time following them. I'm sorry about that, Your Honor. I'll try and clarify now. So the main point is whether or not the BRI standard was properly applied to the claims pending in the application, and namely whether or not the construction given to two of the terms, the first being traversing, was properly analyzed in a vacuum without consideration of the prosecution history statements and to a degree consideration of the surrounding claim language in the claims. The traversing claim is germane to both claims 1 and 21, which we've grouped together as the loop wire claims, traversing claims, and then there's the cavity claims, of which the word between is of issue. I wanted to primarily focus on traversing since that one seems to have the biggest, seems to be the biggest divide between the PTO and us, namely can the prosecution history be used at all when you have a pending case or ex parte case before the trial and appeal board, and I don't see the law saying that there should be some outright prohibition against doing such, although it is true that you're able to amend the claims. Well, we have figure 14C of Eli, and do you agree that that shows traversing as you think it should properly be defined? That is correct, Your Honor. Yes. So what's wrong with the finding that that anticipates? Well, the figure 14C is not what's being relied upon to show anticipation of claims 1 and 21 in the progeny. 14C was used, albeit I guess unsuccessfully, to elucidate what the intent was with the word traversing, namely that there has to be some interception between the loop wire and the housing that holds it, so that way it doesn't float freely, but what has been used otherwise are the other embodiments of Eli that clearly show the rotor and spring and assembly being fully within the conduit. So are you saying 14C is irrelevant to the anticipation analysis? 14C was not relied on by the patent examiner to reject the claims. It was used by the applicant to show what traverse meant. The applicant went so far as to say that the traverse, the only embodiment of Eli that was relevant to that term was 14C because it did show a wire going through the housing. It does show traversing in your view, right? That's correct. But the issue with that was, as was explained in the office, the non-final office action response of March 12, 2012, was that it seems that the wire there is actually stuck and embedded in the housing such that it could not rotate, which again is another limitation of the claims, that they be rotatively coupled. So it was there that it seemed clear what traversing meant, but following from that office action response, the examiner chose not to accept it. They chose a broader definition. They said they looked at dictionaries. There was reference to the language used in the specification to refer to non-mechanical embodiments, namely electrical embodiments that used the word traverse to reference current or magnetic field. And at that point, it ended. That was the inquiry. It had always been the argument that, well, listen, the argument that Your Honor, Judge Dyke, just mentioned about traversing in Figure 14C clearly showed that what was being referred to here. But as I understand from the response brief is that the PTO doesn't have to consider the prosecution history when you analyze claims on the broadest reasonable interpretation because the application is still amenable to amendment. I don't think that distinction is just. I don't think even the law, I mean, In re Moris doesn't support that proposition at all in that case. That was an ex parte case where this court looked at the prosecution history. I mean, in fact, the argument is pretty simple that I put forward in the reply is namely that the public can rely on it. These applications are public. Anything you say. In fact, I don't know how a case would issue unless the examiner or the PTO is going to rely on what the representations are about the language or the prior art to allow you to be granted the patent. This is the quid pro quo. And so essentially these arguments being made, whether it be ex parte, IPR, re-exam, the prosecution history should always be consulted. It provides some intel into what exactly is meant by the words being used. And certainly the argument that an amendment, the Yamamoto line of cases and its progeny do say yes. You have to look at the fact that amendment is the ability to amend the claim does mean you apply broadest reasonable interpretation. But you could also argue the claim as well and provide further elucidation. So the distinction that you can't apply here just seems very superficial in that. I don't think it really helps in the grand scheme of things since the public is going to be analyzing the case for whatever amendments or statements are made by the applicants as the case goes to issuance and is ultimately granted. So in that vein, I think on the traversing limitation, the prosecution history certainly is relevant, should have been considered and in fact is determinative because the prior art cited Estevez with respect to claim 21, which is a loop wire traversing claim, and Eli, the embodiments just don't show each and every limitation of the claim. As to the between term that's used in claim 16, which is part of the cavity claims, it's difficult to reconcile the finding that Eli does not show a loop wire rotating coupled in a cavity, but yet Estevez does. I think there it's stated over and again what the word between meant as between the surfaces. It's understood that the PTAB's position is that you could pick any surface on the structure anywhere and then say, well, if it lies between those two, then you meet the claim limitation. But it goes back to reasonableness of the construction. And I think a lot of the cases that are cited here, the in-ray man machine case is just one, but it really boils down to is the PTAB going to construe the term such that the invention that's thereby claimed is now something that's no more supported in the specification? How far can the broadest reasonable interpretation permit the office to go in terms of characterizing the claim? We certainly, obviously, you want to be able to avoid granting patents that have language that may be indefinite or that may be going too far afield from what is disclosed. But when the patent office is basically seeing that the applicant's telling you what the terms mean, what they mean specifically, that guidance, I think, is instructive and really determinative. It seemed in this case there just was no heed paid to what the applicant was saying about the language. And it wasn't to broaden the claim. It was just to help guide the patent office to figure out why the prior art was not applicable to these claims as drafted. I mean, there's disclaimers in a litigation context. I mean, here it was difficult to fathom how the broadest reasonable interpretation could have been reasonable, albeit broad, but how could it be reasonable when it basically permits a claim construction that can encompass volumes that were never disclosed? And that's what the in-ray man machine case mentions as well. We don't want to go so far afield that the claim has created a new invention that was never in the specification of the applicant under review. The next item that presents itself here, and procedurally, the enablement issue with respect to Estevez, earlier today we heard about black boxes with respect to damages. This is a black box patent. There's a box mark generator. And with one line or two in the specification of this issue patent, it says that it refers to a wire coil with a turbine. It's a DC generator. And then voila, you have the specific structural requirements of the cavity claims. There, the real issue is that you can't define one way or another what Estevez is really describing in there. I mean, the box mark generator could be any number of different structures. And certainly it's, you know, the board cited to the fact, I mean, the board seemed to almost concede that there's an admonishment in Estevez that, well, it doesn't need to tell you the details because they're well known. And yes, in appendix 12, it says, we are also mindful of Estevez's admonishment, see supra, that, quote, suitable generator 16 are well known, citation omitted, and hence it appears that there was no need for Estevez to replicate something that was well known. But that's, you know, Estevez's disclosures don't tell you what generator it does refer to. Even the brief sentence that mentions the wire, coil, and turbine doesn't tell you, well, how is it arranged? You know, the claim calls for a first portion, second portion, first portion rotatively coupling, the second portion, the first portion traversing the housing. The Estevez, and I'm sorry, with respect to claim 16, it also talks about loop wire, you know, rotatively coupled within a cavity. It just, at that point, the question has to be asked, what is Estevez really showing? It has to be clear. And I think the clarity concern that was raised is if, in the event, Estevez meets the requirements to be a prior art at all, then you can look at, well, is it clear enough? Is it a not ambiguous prior art reference that shows each and every limitation of the claims? But before you even get to that, to figure out whether it's a prior art at all, figure out whether or not, is it enabling? The legal question of enablement is reviewed de novo by this court and the factual findings for clear error. However, the factual findings, really, a lot of it stands unrebutted. The concern raised by the PTO about the article that was cited to show that an implantable turbine was made years after the filing date of Estevez was just meant to show that there, you know, obviously it wasn't constructively reduced to practice. Whatever was stated there was not enough. And certainly, there was the other surrounding circumstances, the Bougie reference, and also the disclosure of Estevez itself that just shows you that there was very little detail provided to allow anyone to make out what, in fact, was being disclosed. I'm going to reserve the rest of my time for rebuttal, unless there's further questions. Thank you, Mr. Parker. Ms. Nelson? Good morning, Your Honor. May it please the Court. I think the problem that we have here and why we are where we are is that the appellants brought in an amendment following the first office action that introduced language, which is what's disputed here. And that language is largely untethered from the specification. And both the examiner and the board dealt with it in different ways, but they were obviously troubled by it. And the examiner wrote indefinite rejections and said, we don't really know what these terms, surfaces, traversed, and so forth, mean in the context of the specification and what's claimed. The board, on the other hand, said, well, okay, we can understand more or less what these terms mean based on their ordinary meaning, dictionaries, and so forth. But again, given the lack of anything in the specification to really cabin the meaning of these terms, the board and the examiner read them broadly and found that the prior art anticipated the limitations. Now, let me begin with the two that I think are primarily in dispute, and that is traversing. Of course, before the board, the principal discussion was about indefiniteness. And only once, and that's at 3.11 of the record, did the appellant actually raise the prior art. And that was in the context of Eli and whether Eli taught traversing. And that's a single sentence on page 3.11 of the record. And the board responded to that, and the board said, and that's at 16 of the record, the board responded and said basically that the rotating portion in Eli is stably connected to the vessel support structure and cites a support to paragraph 20 of Eli. And if we look to paragraph 20, which is at 5.60 of the record, what we learn from Eli is that the rotating portion is stably connected and gives examples of how. And I submit that one of those is actually what you've observed in one of the figures. But the three examples it gives is radial installation of the rotating portion within the vessel support structure. Then it also suggests that the rotating portion can be coupled to the frame such that it actually is located extraluminally, so it actually has to pass through the vessel support structure. And then finally, it gives an example at the top of the next column, where it describes the rotating portion can be integrated within the vessel support structure's frame. So I submit that under any construction, so all this, I guess, discussion, and even in the reply brief, Appellant has a figure where they try to parse between cross and through. I don't think that, and they show this figure A as being cross and B as being through, I don't think there's any indication the board was reading cross to mean like A, which is basically juxtaposed next to the surface. The board was clearly interpreting a cross and through as being synonymous and under any construction. What about the question of whether the prior art was enabling? What's the view on that? The view of the enablement rejection, I mean, the enablement issue is simply that Estevez teaches all of the limitations that are disclosed in Claim 16. And in particular, Estevez describes each of the limitations of the generator that are claimed in Claim 16, and those are even claimed in Estevez. If you look to Claims 4, 16, 24, and 35 of Estevez, they actually recite the exact limitations with respect to the generator and the arrangement of the looped wire within the generator that Appellant is alleging is not enabled. Moreover, Estevez talks about generators, they describe one generator, and they also describe and discuss that many, many generators were well-known in the prior art. And finally, the only rebuttal evidence that Appellant has brought forth is a two-page article that is at 319 to 20 of the record, and all that is in that is simply a discussion of three independent groups that have actually successfully made these types of implantable devices, and one of which was actually patented a year after Estevez, and it's the office's position as that is actually evidence that supports enablement and does not in any way show that Estevez is not enabled. Estevez is a patent, it's entitled to a presumption of enablement, and we see nothing in that rebuttal evidence that would indicate otherwise. You're saying that we assume it's enabled, and this is a failure of proof? A failure of proof. Yes, Judge Newman. And if I may briefly touch on the other issue, which is the cavity between the interior and exterior surfaces, the board cited several pieces of evidence in Estevez, and again, we find nothing really in the specification, and I'll turn to their specification in a minute, but we find nothing in their specification that really gives us a good sense of where the interior and exterior surfaces are and where the cavity is. And so given that, the board read it broadly, and they found within Estevez three different pieces of evidence. Evidence one is at column one, lines 63 to 64, where Estevez discusses the generator being coupled between an inner portion and an outer portion, suggesting it's between some sort of inner and outer surface. Column three then talks about a coupler, 28, that houses the generator, and that is depicted on figure one, and as you can see from figure one, the coupler actually goes around and encircles the generator and the board fairly viewed, one wall at the top of the figure as being the exterior wall and one wall at the bottom as being the interior surface, or alternatively, you could even look at the left wall as being an exterior surface, and there are other walls that come in from the right-hand side of the figure and the surfaces on the ends of those that abut are on the interior side of the generator. So there was actually, that was a fair reading of Estevez, and frankly, if you look to their own specification, as much as Appellon has argued that the board was wrong and should have read, should have looked for and expected the generator to be between or within the wall, inside the wall, if you actually look to figure 1A of their own specification, where we see the cavity is labeled as C and the wires within that, and that is similarly situated in the middle of the device, away from the tissue surface, and so that was consistent, the board's interpretation of Estevez was fully consistent with how the term is used in the specification. If there are no additional questions... Where do I find paragraph 20 of E-Line? What page is that on? I'm sorry, that is at page 560 of the record, and it begins at the bottom left-hand column and continues on to the top of column 2. And where does that, that doesn't specifically refer to figure 14C, right? It doesn't, but I think it's fair to understand when it's talking about the rotating portion, at least one example where the rotating portion is located extraluminally, and on 14C we see some of those where it's showing the rotating portion extending outside of the vessel support structure. And where does the board refer to paragraph 20 of E-Line? It's on page 16 of the record, and again, they only made a single page argument, single sentence argument, but... I'm sorry. I see, I see what it is. Okay, thank you. Yes, it says it's stably connected and they cite to paragraph 20. If there are no additional questions... No questions? Thank you. Thank you, Your Honor. So addressing first the E-Line disclosure of paragraph 20, the embodiments in appendix 555 do show some of these other arrangements of how the structures are extraluminal and intraluminal and how they are attached to the support structure, and 14C, of course, was the one on which the applicant had relied. The disclosure in paragraph 20 does not elucidate the claim language of the traversing claims as being met, because again, the rotating structure in E-Line is... and sometimes it's a continuous ring, other times it's just a bunch of... they call them blades. These blades are in the fluid because they will interact with the fluid and thereby rotate. Or, again, in 14B, it seems to be... the numeral 1914 is showing one that's a blade that's extraluminal. The point is that the claims in an applicant's application are directed to situations such as 1924 and figure 14Cs where the wire itself rotatably couples itself to the structure or housing. Again, all of E-Line's embodiments talk about some sort of extension, be it a spring or some sort of other cylindrical device that holds a rotor, and then from the rotor extends these blades. The problem with that is that the claims call for a loop wire and that the wire is rotatably coupled in the cavity. It doesn't say that the wire is coupled via rotor or via some other means. So the wire itself... and this has been, again, made very plain over and again in the appeal briefing with respect to traverse and even with respect to the between language that the claim is calling for a loop wire that's going through at least one of the surfaces in the housing and that it's being lodged in the cavity. The reference to figure 1 of the application in that embodiment does show a cavity. That is true. But the cavity there is, again, located in the housing. The housing is generally denoted 7 in all the figures. So I think I could... So in figure 1A, appendix 92, the cavity C is not contrary to what's been advocated here. Namely, the cavity exists in the structure that's implanted in the device. So, again, the question is, does between allow you to pick any surfaces that one wishes and then say, well, hey, there's the cavity. The problem, of course, is that the board already agreed with the appellant's construction of interior surface. This is on page 26 of the brief, but it's also in appendix 7, where the PTAB agreed with the appellant's interpretation of the terms to overcome the indefiniteness requirement where the internal surface and the exterior surface are actually defined in terms of their proximity to the fluid. So, and then further with respect to Estevez, the record does show other evidence beyond just the article. There's the Booge references relied on to show what is, in fact, expected to show what an implantable generator should appear like. And I see my time is up, so if there's any further questions, I'll just close. Any questions for Mr. Franco? Thank you. Thank you, Your Honor. The case is taken into submission. That concludes the arguments for this session of this panel. All rise. The Honorable Court is adjourned until tomorrow morning. It's at o'clock a.m.